# In the United States Court of Federal Claims

No. 14-1223C
(Filed: September 22, 2017)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
                                        *

**PREMIER OFFICE COMPLEX**       *
**OF PARMA, LLC,**               *
                                        *
                                        *
                     Plaintiff,       *
                                        *
     v.                              *
                                        *
**THE UNITED STATES,**         *
                                        *
                     Defendant.     *
                                        *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## OPINION AND ORDER

**DAMICH**, Senior Judge:

This action was brought by Premier Office Complex of Parma, LLC ("Premier"), requesting damages for an alleged breach of contract with the United States, acting through the Department of Veterans' Affairs ("VA").   In the complaint, Premier alleges that the VA directed it to perform work outside the scope of the contract to build an outpatient clinic in Parma, Ohio. Specifically, Premier alleges that the VA breached by requiring it to comply with the physical security requirements set forth in the Interagency Security Committee ("ISC") Standards.   The government maintains that compliance with these security requirements was required by the plain language of the contract and, therefore, was not outside its scope.

The case is now before the Court on the government's motion for summary judgment. After briefing and oral argument, for the reasons discussed herein, the Court **GRANTS** the government's motion for summary judgment and **DENIES** Premier's cross-motion for summary judgment on liability.

### I.    Background

#### a.   The Lease between VA and Premier

The facts surrounding this case are uncontested by the parties.   On May 17, 2007, the VA issued a pre-solicitation "Expression of Interest" which stated that the Parma Clinic "must comply with the Inter Agency Security Committee Design Criteria . . . as well as other security guidelines, which will be provided during the solicitation for offers process."   A1.   Section

4.2.7 of the Solicitation for Offers VA-101-08-RP-0034 ("SFO") discussed the physical security of the lease and is reproduced below:

### 4.2.7          Physical Security Requirements

Lessor shall provide the following physical security measures or features for the spaces or areas as listed below:

1. The Government will determine security standards for facilities and agency space requirements.   Security standards will be assessed based upon tenant agency mix, size of space requirement, number of employees, use of the space, location of the facility, configuration of the site and lot, and public access into and around the facility.   The Government will designate a security level from Level I to Level IV for each space requirement.   The Contracting Officer (or the Contracting Officer's designated representative) will provide the security level designation as part of the space requirement.   A copy of the Government's security standards is available at www.oca.gsa.gov.   A single use building over 70,000 square feet will be a Level III Security Requirement.

A53 (bold in original).   Below this text, Section 4.2.7 then listed seven specific areas in a "Physical Security Table": Pharmacy and Supply Drug Storage Rooms, Pharmacy Dispensing Areas, Pharmacy Manufacturing Area, Acquisition and Material Management, Information Resources Management, Telephone Equipment Room, and Treatment Rooms, and labeled sixteen specific applicable physical security requirements.   A53.

On May 22, 2008, the VA held a pre-proposal conference with the offerors, including Premier, regarding the SFO to build the Parma facility.   Def.'s Mot. Summ. J. at 3. On June 3, 2008, the VA issued Amendment #1 to the SFO to further clarify and modify specific sections, including the physical security requirement. A17; A151 ("VA's clarifications have required modifications to the SFO").   In relevant part, Amendment #1 stated that:

### 4. Security Level – Clarify whether the project requires Level 2 or 3 security.

Based upon the ISC Standards, the project would be a Level 2, based on 11 – 150 personnel and a size of 2,500 to 80,000 rentable square feet.

A152 (bold in original).

On June 10, 2008, Eugene Deal, Premier's Owner, initialed Amendment #1.   A153. After Amendment #1 was issued, Premier submitted, in its own words, a proposal "at a conceptual level."   The proposal did not address the physical security requirement set out in Amendment #1.   *See generally* A154-69.   Nevertheless, Premier and the VA entered into Lease No. V101-08-RP-0034 on November 12, 2008.   Def.'s Mot. Summ. J. at 5.

The language of the lease provided that "the Lessor shall furnish to the Government, as part of the rental consideration . . . a fully built-out space as described, all services, maintenance,

alterations and other considerations as set forth in Solicitation for Offers No. VA-101-08-RP-0034, *and all amendments*."   A6 (emphasis added).   The lease also specifically incorporated into the lease Amendments 1, 2, and 3, along with the offeror's responses to such.   A7.

### b.   Post Execution of Lease Events

In early March 2010, about one and a half years after the execution of the lease, Jacob Wattenbarger, the VA's Resident Engineer for the project, asked Premier how the ISC Standards were to be addressed in the design.   A320 (referring to Section 4.2.7 of the lease and Amendment #1).   After listening to these concerns, Premier first objected to a reading of the contract that required it to comply with ISC Standards.   Pl.'s Resp. at 13.   Then on March 9, 2010, Premier attempted to access the Standards, for the first time, by writing to the Department of Homeland Security.   However, this attempt was unsuccessful, for the Department would only release the documents to a requesting Federal contracting officer or a technical representative "who has a need to know the information."   A323.   Premier also attempted to access the Standards online, via a website referenced in Section 4.2.7 (www.oca.gsa.gov), but this attempt was unsuccessful as it was not available to the public.   Pl.'s Resp. at 13.

On March 16, 2010, VA's Resident Engineer provided Brian Bauer, Premier's Architect, via email, the ISC Security Design Criteria, ISC Standards for Leased Space, and Facility Security Determinations for Federal Facilities documents.   A178-318.   Ten days later on March 26, 2010, VA's Resident Engineer wrote again to Premier and provided the VA Life-Safety Protected Design Manual stating, "It is more straight forward (sic) than the ISC and should have been included in the SFO."   A326-27.   According to Premier, they were to, "disregard the references in the SFO for security requirements and incorporate only the requirements as indicated in this latest VA Physical Security Guide."   A325-26.   Also, in a VA memorandum to Premier's Owner dated April 2, 2010, Premier was directed to "design the facility according to the VA Life-Safety Protected Design Manual."   A330.

However, on July 26, 2010, VA's Resident Engineer backtracked on his April 2 Memo and wrote to Perry Hostetler, Premier's Project Manager, that "the ISC is the design standard, and the facility should be designed with that criteria . . . [Premier should] make the necessary changes," in order to comply with that standard.   A332.   On October 26, 2010, Premier's Project Manager wrote to VA's Resident Engineer in order to clarify the physical-security requirements for the building.   A338.   It was Premier's understanding that only the specified areas listed in the "Physical Security Table" in Section 4.2.7 would need to comply with the ISC. A338.   Any additional area the VA wanted to be built according to that standard Premier, "need[ed] to know if it is their intent to pay for the additional design and construction cost." A338.   On October 29, 2010, VA's Resident Engineer responded:

In response to the letter dated October 26, 2010 regarding the physical security requirements, the SFO states that the project must conform to the ISC Level II Security requirement at no additional cost to the government.

The ISC Level II Security Requirement was known to all offerors on June 3, 2008 by Amendment #1. Amendment #1 section 4 states, "Based upon the ISC

Standards, the project would be a Level 2, based on 11-150 personnel and a size of 2,500 to 80,000 rentable square feet." Even though the ISC is classified, it was available upon request prior to bid.

The SFO must be read in its entirety for an accurate interpretation of the requirements. When reviewing the ISC Standard, it pertains to an entire building not individual rooms. The opening sentence of the SFO Section 4.2.7 refers to item #1 which discusses the designated ISC Security Requirement for the building as a whole. The table is a requirement in addition to the ISC Standard and clearly outlines the applicable requirements for each location.

A339.

Even though Premier disagreed with this, in the end, the building was built in accordance with the ISC Standards.  Compl. ¶ 18.  On February 14, 2011, Premier wrote to the project's contracting officer asking for a determination on the physical security requirements, and then on November 1, 2011, Premier's counsel requested payment of $964,356.40 to cover costs associated with the alleged out of scope work.  A340-53.  On December 5, 2011, the contracting office issued a final determination and denied the request for payment because, "[t]he building security requirements were clearly spelled out within the SFO in Section 4.2.7 and then clearly confirmed in Amendment #1 prior to the Lessor providing a bid and receiving the award."  A355.  On February 11, 2014, Premier submitted a certified claim to the same contracting officer to which the VA did not respond.  A372-83.  This lawsuit followed.

## II.      Standard of Review

The Rules of the Court of Federal Claims ("RCFC") provide that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  A fact is only "material" if it might "affect the outcome of the suit under the governing law." *Id.*  "Contract interpretation is a question of law generally amenable to summary judgment," for questions of law do not turn on factual disputes.  *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002).  There are no genuine disputes of material fact and, therefore, this matter is ripe for review.

## III.     Discussion

Here, the government argues that the original SFO, and all incorporated documents, especially Amendment #1 ("Based upon the ISC Standards, the project would be a Level 2…"), required that the entire Parma facility would be built in accordance with ISC Standard Level II. Besides Amendment #1, the other key document is Section 4.2.7 of the SFO, "Physical Security Requirements," which has been quoted above.   The government points to the text of Paragraph 1

of this section, which repeatedly uses "facility" in addition to individual "space requirements."[1] In addition, the government notes that this paragraph mentions the ISC levels of security[2] and references a URL where the security measures may be found: "www.oca.gsa.gov."[3]

Thus, the Government concludes, that the offerors, including Premier, were on notice prior to bid, that the facility would be built according to an ISC Level II security requirement and, therefore, compliance cannot constitute an express or constructive change to the lease and the work cannot be characterized as out of scope.

As the Court has already stated, Premier argues that it is entitled to summary judgment because the VA changed the lease by directing it, after execution of the contract, to add certain security features to Premier's design at no extra cost to the VA so that the entire facility would conform to ISC Level II.   Compl. ¶ 11.   Specifically, Premier was required to change the "foundation, structural steel and curtain wall elements, roof framing and thickness, the fenestration and window glazing, and site security elements (pipe bollards)."[4]   Compl. ¶ 11.   In other words, Premier maintains that "the addition of the security requirements constitute[ed] an express [or constructive] change in the Lease . . . for which Premier should be compensated." Pl.'s Resp. at 11.

Although Premier sets forth a host of arguments,[5] the Court, especially after oral

---

[1] "The Government will determine security standards *for facilities* and agency space requirements.   Security standards will be assessed based upon . . . location of the *facility* . . . and public access into and around the *facility*."   Def.'s Mot. for Summ. J. at 12 (emphasis in original).

[2] "The Government will designate a security level from level I to level IV for each space requirement . . . A single use building over 70,000 square feet will be a Level III Security Requirement."   A53.

[3] Premier did not try to use the URL reference until March 2010, one and a half years after the execution of the lease.   Pl.'s Resp. at 13.

[4] These security features were meant to mitigate the impact on the structure and façade if a blast or explosion occurred.   Compl. ¶ 11.

[5] Specifically, Premier first contends that the ISC Standard, which was not expressly incorporated into the lease, should not control over the Proposal that is expressly incorporated into the lease.   Pl.'s Resp. at 9.   Second, Premier argues that the VA changed the lease by adding physical security requirements in March 2010 and was ultimately unable to understand which physical security standards were required for the Parma facility.   Pl.'s Resp. at 10-12. Third, the "VA failed to disclose the physical-security requirements before the award, because neither Section 4.1 of the SFO . . . nor Section 6 of the SFO . . . lists the ISC Standards as among those to be applied."   Compl. ¶¶ 22-23.   Similarly, Premier maintains that Section 4.2.7 does not require the entire Parma facility to meet the ISC Standard or VA Design Guide.   Pl.'s Resp. at 16.   Fourth, Premier suggests that the VA's reliance on the reference to "Security Levels" in Section 4.2.7 is misplaced and argues that only the specific spaces mentioned in that section needed to satisfy the physical security requirement.   Pl.'s Resp. at 19.   Fifth, Premier asserts that Amendment #1 did not establish that the entire facility should be built according to the ISC Standards because the ISC Standard was not incorporated into the amendment.   Pl.'s Resp. at

argument, believes that the essence of Premier's case is its differing (from the government's) interpretation of SFO Section 4.2.7 and Amendment #1.   Premier argues that Section 4.2.7 requires ISC Level II compliance only for the spaces or areas that appear in the "Physical Security Table" that follows upon Paragraph 1 of 4.2.7.   In support, it points to the opening sentence: "Lessor shall provide the following physical security measures or features *for the spaces or areas as listed below.*"   A52 (emphasis added).   The only "spaces or areas listed below" are in the Physical Security Table.

Regarding Amendment #1, although Premier does not dispute that it is part of the contract, it argues that the language adopting ISC Level II security does so only for the spaces listed in the Physical Security Table.   Premier notes that Paragraph 1 states that ISC Level III is required, while Amendment #1 requires Level II.   In general, Premier argues that the VA had no clear idea of the spaces or areas that required security or of what level of security was needed for each space or area.   According to Premier, this is proved by the actions of the VA Resident Engineer, Jacob Wattenbarger, who, after construction had begun, first told Premier to ignore the ISC Standards and to use the VA Design Guide instead, before reversing himself and insisting that Premier use the ISC Standard Level II for the entire facility.   Finally, Premier notes that its "[p]roposed building plans," were incorporated into the lease despite the fact that they did not provide for Level II security for the whole facility.

> *a.   Even though Latent Ambiguities in Contracts are Typically Construed Against the Drafter, Premier's Interpretation of this Contract is Unjustifiable*

When a contractual dispute arises, the Court's first task is to discern whether the disputed provision is unambiguous from its language, or, if it is susceptible to more than one reasonable interpretation.   *McAbee Constr. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996).   In order to do so, the Court begins with the plain language.   *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993).   *See also C. Sanchez and Son, Inc. v. United States,* 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof.").   If it is determined that the provisions are clear and unambiguous "they must be given their plain and ordinary meaning," *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993).   It is clear that the ordinary meaning of the contractual provisions govern, and not a party's subjective but unexpressed intent.   *Andersen Consulting v. United States*, 959 F.2d 929, 934 (Fed. Cir. 1992).

"By contrast, a contract provision is ambiguous 'only . . . if susceptible to more than one reasonable meaning,' and each meaning 'is found to be consistent with the contract language,'" *W. Bay Builders, Inc. v. United States*, 85 Fed. Cl. 1, 15 (2008) (citations omitted).   Generally, "ambiguities in a government contract are normally resolved against the drafter. "   *Triax Pac. v. West*, 130 F.3d 1469, 1474 (Fed. Cir. 1997).   There are two types of ambiguities in contracts: latent and patent.

---

20.   Sixth, Premier asserts that the VA's interpretation of Section 4.2.7 would render the SFO ambiguous and misleading.   Pl.'s Resp. at 22.   Seventh, Premier claims that the VA cannot shift the burden for its mistake in drafting the SFO.   Pl.'s Resp. at 25.   Finally, Premier asserts that later reiterations of the SFO conform to their own interpretation.   Pl.'s Resp. at 27.

A patent ambiguity is one that is "obvious, gross, [or] glaring."   *H & M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974).   This type of ambiguity in a government contract "raises the duty of inquiry, regardless of the reasonableness of the contractor's interpretation."   *Fortec Constructors v. United States*, 760 F.2d 1288, 1291 (Fed. Cir. 1985). Absent such inquiry, the patent ambiguity will be resolved against the contractor.   *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1342 (Fed. Cir. 2004).

A latent ambiguity is a "hidden or concealed defect which is not apparent on the face of the document, could not be discovered by reasonable or customary care, and is not so 'patent and glaring as to impose an affirmative duty on plaintiff to seek clarification.'"   *Diggins Equip. Corp. v. United States*, 17 Cl. Ct. 358, 360 (1989) (citations omitted).   It generally becomes evident "when considered in light of the objective circumstances, two conflicting interpretations appear reasonable."   *Input/Output Tech., Inc. v. United States*, 44 Fed. Cl. 65, 72 n.10 (1999). Determining that an ambiguous provision is latent does not immediately result in a victory for the contractor.   Rather, the court may adopt the "contractor's interpretation of a latent ambiguity . . . only . . . if it is found to be reasonable."   *Cmty. Heating & Plumbing v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993).   Ultimately, the Court "must interpret the contract as a whole to give reasonable meaning to all its parts."   *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992).

Section 4.2.7 is latently ambiguous.   It states that the "Lessor shall provide the following physical security measures or features *for the spaces and areas as listed*."   A52 (emphasis added).   Paragraph 1, however, then speaks of facilities (not just spaces and areas) and levels of security in the ISC Standards (by implication), concluding with what turned out to be the wrong level of security for the facility!   This paragraph is then followed by a Physical Security Table which lists particular spaces or areas.   Thus, it is no wonder that Amendment #1 had to be issued to clarify this section and that the VA Resident Engineer was confused as to whether the ISC Standards or the VA Design Guide applied.   Looking at the first sentence of 4.2.7, which refers only to "spaces and areas listed," coupled with the provision of a Physical Security Table that lists certain spaces and areas, one is at a loss to understand the relevance of Paragraph 1 with its references to "facilities" and to security levels that are drawn from the ISC Standards.   This is especially true since the requirements set out in the Table are not ISC Standard requirements. Under these circumstances, it is perfectly understandable how a contractor would ignore Paragraph 1 and conclude that Section 4.2.7 directs it to follow the security requirements set out in the Physical Security Table.   But the question is: Was this conclusion justifiable?

As Section 4.2.7 is latently ambiguous, Premier did not have a duty to ask for a clarification.   Nevertheless, as revealed at oral argument, *some* potential bidder did ask for a clarification of the security level, perhaps prompted by the incorrect statement in Paragraph 1 of the security level required for this size of a building.   Consequently, the VA did issue a clarification in Amendment #1, stating that the "project" would be "Level 2."   A152.   Because of Amendment #1, this Court does not have to resolve the latent ambiguity of Section 4.2.7. Instead, it has to interpret the contract as whole, taking into consideration the impact of Amendment #1 on Section 4.2.7.

Amendment #1 (agreed to at a date after Section 4.2.7 was issued) clearly requires ISC Level II security for the whole "project."[6]   For the Court, this statement is not ambiguous. Premier, however, believes that Amendment #1 simply corrects that sentence in Paragraph 1 of 4.2.7 which states that a building of the size planned would be at Level III.   This would be a plausible reading were it not for the use of the word "project" in Amendment #1.   A definition of "project" from Oxford's English Dictionary is: "an individual or collaborative enterprise that is carefully planned to achieve a particular aim."   Oxford US English Dictionary, project (https://en.oxforddictionaries.com/definition/project).   The particular aim of the planned collaborative enterprise in this case is the construction and lease of a building.   Furthermore, the Court notes that the requirements in the Physical Security Table in 4.2.7 are not requirements based on the ISC Standards.   Therefore, had Premier consulted the ISC Standards in a timely manner, it would have seen this discrepancy and not fallen into the misconception that the ISC Standards only applied to the spaces and areas listed on the table.   Applying the plain meaning of "project" to Amendment #1, the Court must conclude that the contract provided that ISC Standard Level II applied to the entire facility.   Although this result is not clear from SFO Section 4.2.7, it is clear in Amendment #1.   The ambiguity of 4.2.7 is resolved in the unambiguous statement found in Amendment #1.

The Court is not deterred from its finding based on the inconsistent statements of the VA Engineer.   At most, this is evidence of ambiguity.   And, in the end, Mr. Wattenbarger insisted on ISC Level II for the whole project.   Neither is the Court deterred by the inclusion in the contract of Premier's plan.   As noted above, Premier submitted, in its own words, a proposal "at a conceptual level."   Therefore, not including the ISC Standards in the plan did not contradict Amendment #1.   Finally, the Court notes that, even before Amendment #1, the VA's Expression of Interest stated that the Parma Clinic "must comply with the Inter Agency Security Committee Design Criteria [ISC Standards]," although this document is not part of the contract.

## IV.    Conclusion

For the foregoing reasons, this Court holds that the VA did not direct Premier to perform out of scope work and, therefore; the Court **GRANTS** the Government's motion for summary judgement, and **DENIES** Premier's cross-motion for summary judgment on liability.   The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge

---

[6] The Court is not persuaded by Premier's attempt at oral argument to make the building not part of "the project."